**Priscilla Chung CLARK, etc., et al., Plaintiffs,**

v.

**Donald BUCHKO, et al., Defendants.**

**Civil No. 94–755 (CSF).**

United States District Court, D. New Jersey.

Aug. 1, 1996.

Wilentz, Goldman & Spitzer by Warren W. Wilentz, Eric J. Marcy, Peter Gaudioso, Woodbridge, NJ, for Plaintiff Priscilla Chung Clark.

Convery, Convery & Shihar by Clark W. Convery, Lindsay B. Schiappa, Metuchen, NJ, for Plaintiff William W. Clark.

Destribats, Campbell, Desantis & Magee by Bernard A. Campbell, Jr., Trenton, NJ, for Defendant Donald Buchko.

Picco, Herbert & Kennedy by Michael J. Herbert, Steven P. Goodell, Trenton, NJ, for Defendant Richard Taylor.

Szaferman, Lakind, Blumstein, Watter & Blader by Wilbur H. Mathesius, Arnold C. Lakind, Lawrenceville, NJ, for Defendant John K. Rafferty.

Wilson, Elser, Moskowitz, Edelman & Dicker by Martin J. Sullivan, Robert C. Neff, Jr., Newark, NJ, for Defendant Hamilton Township.

AMENDED OPINION

CLARKSON S. FISHER, District Judge.

On February 21, 1992, a team of agents of the Federal Bureau of Investigation (FBI), assisted by officers of the Hamilton Township, New Jersey, Police Department (HTPD), went to the residence of Kenneth Clark, a local attorney, to execute an arrest warrant for Clark and a search warrant for the premises.[1] During the execution of those warrants, Clark was fatally shot in the back by the accidental discharge of a shotgun carried by HTPD Detective Donald Buchko. As a result of that shooting, this civil rights action was filed. Before the court are the motions for summary judgment of defendants Donald Buchko, Richard Taylor, John K. Rafferty and Hamilton Township.

I. Factual Background

On January 28, 1992, an armed robbery occurred at the branch bank of the Greater Bethlehem Savings and Loan Association, lo-cated at 358 South Walnut Street, Bath, Pennsylvania. Report of the Office of the County Prosecutor, Mercer County, dated May 14, 1992, attached as Def. Taylor's Ex. M. On February 15, 1992, the Philadelphia Division of the FBI advised the Newark, New Jersey, Division of the FBI that it suspected that one Kenneth J. Clark had committed the robbery and was residing in New Jersey. Special Agent James Maxwell was assigned to identify Clark and conduct further investigation. Declaration of James M. Maxwell. ¶ 2 (Maxwell Declaration).[2] The subsequent investigation revealed that Clark was residing at 58 Soloff Drive, Hamilton Township, New Jersey. Id.

In the course of the investigation, Maxwell learned that a cooperating witness had approached the narcotics unit of the HTPD and indicated that Clark had asked the cooperating witness to be the driver for a future bank robbery. Id. at ¶ 3. The FBI and a member of the HTPD narcotics unit met with the cooperating witness. The cooperating witness agreed to meet with Clark on February 21, 1992, try to engage Clark in conversation about the planned bank robbery, and record the conversation with Clark. As a matter of courtesy, and because the cooperating witness had been developed by the HTPD, the FBI asked the HTPD to participate in the execution of the arrest and search warrants; however, HTPD officers were not deputized as federal law enforcement officers. Id. at ¶ 4.

On February 19, 1992, an arrest warrant charging Kenneth Clark with bank robbery was issued by the Honorable Arnold C. Rapoport, United States Magistrate Judge, Eastern District of Pennsylvania. Report of the Office of the County Prosecutor, Mercer County, dated May 14, 1992, attached as Def. Taylor's Ex. M. On February 20, 1992, a search warrant was issued by the Honorable John J. Hughes, United States Magistrate Judge, District of New Jersey, for the residence of Clark. Id.

---

1. The following facts are based on the undisputed record before the court.

2. The declaration of Special Agent James M. Maxwell was previously filed with the court in support of a motion by the United States to dismiss third-party claims. For purposes of this motion the court will refer to that declaration.

On the morning of February 21, 1992, Maxwell conducted a briefing for the ten FBI agents and four HTPD narcotics unit officers assigned to participate in the execution of the arrest and search warrants. Id. At the briefing, each member of the team was provided a photograph of Clark and informed that Clark was to be considered armed and dangerous. Id.

The arrest plan called for one team of officers to secure a perimeter around the premises. Another team was assigned to enter the front driveway and secure any vehicles. A third team was to proceed to a trailer located at the rear of the residence and secure any individuals in the trailer. A fourth team was to proceed to a rear door of the residence leading to the kitchen and attempt to " 'call out' Kenneth Clark." Id. If Clark did not comply, tear gas would be employed. Maxwell Declaration at ¶ 5; Buchko Dep. at 60. If the tear gas did not drive Clark out, an entry would be made. Id.

At approximately 11:10 A.M., Clark returned to the residence and the cooperating witness proceeded to the residence. Maxwell Declaration at ¶ 7. The cooperating witness remained in the premises for approximately 25 to 30 minutes before leaving and being picked up by an FBI surveillance vehicle. Id. All agents and officers were then informed that the cooperating witness had reported that Clark was inside the house, that a hidden weapon was probably located in the living room couch, and that Clark had stated he would not be taken alive if confronted by law enforcement. Id. Supervising agents at the scene were informed of these developments and authorized Maxwell to proceed. Id. at ¶ 8.

Eight men, including Maxwell, were deployed in two teams to secure the trailer and to approach the rear of the house. Id. at ¶ 9. As the men were approaching the house and the trailer, the surveillance team informed them, via radio, that an unidentified male had arrived and that he had been observed both in the driveway and to the rear of the building. Id.

Maxwell, FBI agents Austin and Jobes, and HTPD Detective Buchko approached the rear door of the house which they had been informed led to the kitchen. Id. at ¶ 10. It was believed that the kitchen had two interior doors, one leading to the living room and the other to the interior hallway. Id. At the time, although the men had reason to believe that Clark was in the residence, they did not know where in the residence he was located or whether the unidentified male was also located inside. Id. In discussions, Maxwell had directed that he would enter first and effect the arrest of Clark. Austin would go to the doorway between the kitchen and the living room, where it was suspected a weapon was located, and Jobes would go to the doorway between the kitchen and the hallway. Buchko was to provide cover for the other three officers and assist as necessary. Maxwell Dep. at 53. Maxwell, Austin and Jobes were armed with MP5's, a nine-millimeter submachine gun, on a sling. Buchko Br. at 6, 16. Buchko, believing he was to provide coverage for the other officers, selected a Remington 1100 automatic shotgun loaded with 00 buckshot. Buchko Br. at 6.[3]

Maxwell opened the rear storm door and the rear inside door, which was unlocked. Maxwell Declaration at ¶ 12. At that point, Maxwell saw two men seated at the kitchen table and recognized Clark as the man sitting across the table and furthest from where he was standing. As he observed both men, they observed him. Id. at ¶ 13. Maxwell yelled "FBI, FBI, you're under arrest, let me see your hands" and entered the kitchen to take the men into custody. Id. As he entered the kitchen, Maxwell approached the unknown man seated closest to him and ordered him to the ground. Id. at ¶ 14. Austin proceeded to the doorway between the kitchen and the living room, Buchko entered the kitchen and Jobes proceeded to the doorway between the kitchen and the hallway. Id. at ¶ 14, 15. Prior to entering the house,

---

3. Buchko's deposition suggests he was instructed to wear a police uniform and carry a shotgun. Buchko Dep. at 51–52. Additionally, he suggests the plan also called for HTPD Officer Keegan to also provide cover with a shotgun. Keegan did not, however, accompany the house team.

Buchko disengaged the safety of his shotgun. Buchko Dep. at 82.

As they entered the kitchen, all the men were yelling "Hands up, hands up," and Clark, seated at the table, initially complied, but then began to lower his hands and move around in the chair. Buchko Dep. at 81, 84. Buchko approached Clark with the muzzle of his gun pointed directly at Clark and instructed Clark to "[p]ut your hands on your head, put your hands on your head." Id. at 83–84. As he moved closer, Clark complied. Id. Buchko then proceeded to get behind Clark and attempt to secure his hands by grabbing them. Id. at 85, 86. In order to grab hold of Clark, Buchko adjusted his grip on the gun so that he was holding the gun stock. Id. at 87. No attempt was made to handcuff Clark. Id. Buchko then directed Clark to the floor yelling "Get down, get down, get down." Id. at 88. Clark began to comply, and in order for him to get down on the floor, Buchko released his hold on Clark's hands. Id. at 89. Buchko then took a step back and adjusted his hold on the shotgun with the intent to provide cover to one of the other officer's while Clark would be handcuffed. Id. at 89–91. As Clark went down to the floor, he went down to a prone position with his palms flat on the floor. Id. at 91–94. He then "sprang up," however, into a "push-up" type position, backing up into Buchko's gun. Id. at 97. Buchko's shotgun discharged, killing Clark.

On February 23, 1992, Buchko provided a formal statement regarding his involvement in the shooting. The statement, quoted in the May 14, 1992, report of the Mercer County Prosecutor's Office, provides:

Q: What happened next?

A: At this time I had both of my hands back on my shotgun and I took a step back so that I could get a better position on the suspect. Clark was still moving around a lot on the floor. His hands were moving, his head was moving back and forth. His whole body was moving around. Because I had the shotgun, I could not move in to handcuff Clark without having to put the weapon down. I stood my position and kept telling him to not move and stay down anticipating that someone was going to cuff

him. At this time Clark began to push up off the floor. I kept telling him to get down, get down! He continued to get up off the floor in a very, very quick motion. At that point, [suddenly] he was back up on his knees. I lost sight of his hands and his left hand went towards the center of his body. I couldn't see his right hand. As he was coming up to his knees, I took my left hand from my shotgun to stop him from coming back. The shotgun barrel was longer than my arm. He backed up and I felt his back hit the muzzle and that's when the gun discharged. I don't remember pulling the trigger.

. . . . .

Q: Did you intend to pull the trigger prior to the discharge of the weapon?

A: No.

Report of the Office of the County Prosecutor, Mercer County, dated May 14, 1992, attached as Def. Taylor's Ex. M.

On February 14, 1994, plaintiff Priscilla Chung Clark, the wife of Kenneth Clark and the executrix of his estate, filed this action pursuant to 42 U.S.C. § 1983. On February 17, 1995, William Clark, the father of Kenneth Clark, filed suit individually against the same named defendants contained in the initial complaint of Priscilla Chung Clark alleging wrongful death. On June 14, 1994, the two matters were consolidated by order of this court. On June 14, 1994, Priscilla Chung Clark filed a First Amended Complaint to name FBI Special Agents Maxwell, Morris Austin and Thomas Jobes as defendants. On December 6, 1994, this court granted a motion of Maxwell, Austin and Jobes for summary judgment and dismissed Count Four of the Amended Complaint against agents Maxwell, Austin and Jobes on the basis that the agents are entitled to qualified immunity. On February 7, 1995, this court granted the motions of defendants Buchko, Taylor and Rafferty to file third-party complaints against the United States of America pursuant to the Federal Tort Claims Act. Finally, on January 11, 1996, this court granted the motion of the United States of America to dismiss the third-party complaint on the basis that the FBI's conduct in planning and

carrying out the execution of the arrest and search warrants is subject to the discretionary-function exception to the FTCA's limited waiver of sovereign immunity, and therefore, this court lacked jurisdiction over the claims.

This matter now comes before the court on the motions for summary judgment of Detective Buchko, Hamilton Township, Hamilton Township Police Chief Richard Taylor and Hamilton Public Safety Director John K. Rafferty to dismiss plaintiffs § 1983 claims. For purposes of this motion the court will refer to plaintiff Priscilla Chung Clark's complaint as the complaint. Count One alleges that Buchko's use of deadly force violated Clark's Fourth and Fourteenth Amendment rights. Count Two alleges the township of Hamilton and defendants Rafferty and Taylor violated Clark's constitutional rights by failing to train its officers properly in the use of force. Count Three alleges the municipal defendants violated Clark's constitutional rights by approving a "policy or custom of unconstitutional and unlawful activities." Count Four of the Amended Complaint was previously dismissed. Counts Five through Nine allege pendent state law claims.

Defendants move to dismiss Counts One, Two and Three on the basis that no constitutional violation occurred, that defendants are entitled to qualified immunity and that no unconstitutional policy or custom existed which promoted the violation of Clark's constitutional rights. Defendants also move to dismiss plaintiff's pendent state law claims on the basis that this court lacks jurisdiction over plaintiff's state law claims once this court dismisses plaintiff's claims under 42 U.S.C. § 1983.

For the reasons that follow, defendants' motions for summary judgment will be granted and plaintiff's claims under 42 U.S.C. § 1983 will be dismissed. Additionally, plaintiff's state law claims will be dismissed without prejudice on the basis that this court lacks jurisdiction. 28 U.S.C. § 1367(c)(3).

## II. DISCUSSION

The entry of summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Connors v. Fawn Mining Corp.*, 30 F.3d 483 (3d Cir.1994). The burden of establishing the absence of a genuine issue is on the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this burden is met, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553. An issue is "genuine" "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

As an initial matter, I begin with a discussion plaintiffs' theory of the case against Detective Buchko. Plaintiffs allege that the conduct of Buchko was negligent, reckless and demonstrated an indifference to the life of Clark. Plaintiff's theory, as discussed in the report of plaintiff's expert, James J. Fyfe, Ph.D., is that it violates accepted police procedure to hold a firearm without maintaining a "safe" distance from a suspect because the suspect may suddenly move or struggle and cause a discharge of the gun. Report of James J. Fyfe, Ph.D., dated January 21, 1996, attached as Def. Taylor's Ex. F. Dr. Fyfe suggests that "in every reasonably trained police department, therefore, officers are made to understand clearly that they must never approach to within arm's reach of a suspect while they are holding a weapon and that they should certainly never attempt to subdue or handcuff a suspect while they are holding a weapon in their hands." Id. Dr. Fyfe suggests that a safe distance is arms-length. Dr. Fyfe suggests that in the instant case Buchko "recklessly" deviated from accepted procedure, placed Clark at risk, and ultimately created the situation resulting in the accidental death of Clark by standing within arms-length of Clark with a

"long gun." Id. Dr. Fyfe attributes this recklessness to Buchko's deviation from "accepted" police procedures as well as a failure to be properly trained.

Accepting this as true, Dr. Fyfe acknowledges that the shooting was not intentional but was rather an accident and nothing in the record suggests otherwise. In fact, it is not suggested by plaintiff that Buchko intended to pull the trigger. Rather, it is agreed that the gun discharged by accident as a result of Buchko's maintaining a close distance, which allowed Clark to back into the gun.

 42 U.S.C. § 1983 does not create any constitutional rights and only creates a cause of action to remedy violations. The initial inquiry in a § 1983 suit involving claims of excessive force involves two issues: (1) whether the conduct complained of was committed by persons acting under color of state law, and (2) whether the conduct deprived a person of the rights secured by the Constitution or laws of the States. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In the instant case, plaintiffs suggest that Buchko, acting under color of law, violated Clark's Fourth and Fourteenth Amendment rights. In response, defendants concede that Buchko was under color of state law, but suggest that no constitutional violation occurred. The court agrees.

 The Fourth Amendment to the Constitution protects against "unreasonable searches and seizures." In *Graham v. Connor*, the United States Supreme Court held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of any arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness standard," rather than under a "substantive due process" approach." *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989) (emphasis in original). As in other Fourth Amendment contexts, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying in-

tent or motivation." *Id.* at 397, 109 S.Ct. at 1872.

 First however, it is necessary to determine whether a seizure triggering the Fourth Amendment has occurred. A " 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, ... in some way restrained the liberty of a citizen.' " *Id.* at 395 n. 10, 109 S.Ct. at 1871 n. 10 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968)). Not every use of force by authorities which results in a restraint constitutes a seizure.

As the Supreme Court explained in *Brower v. Inyo County*, 489 U.S. 593, 596, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1988), "the Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct." In *Brower*, the heirs of Brower brought suit after Brower crashed into a police roadblock and was killed. The heirs alleged that the police acting under color of law,

> (1) caused an 18–wheel tractor-trailer to be placed across both lanes of a two-lane highway in the path of Brower's flight, (2) 'effectively concealed' this roadblock by placing it behind a curve and leaving it unilluminated, and (3) positioned a police car, with its headlights on, between Brower's oncoming vehicle and the truck, so that Brower would by blinded by the approach.

*Id.* at 594, 109 S.Ct. at 1380.

The District Court granted summary judgment on the basis that the complaint failed to state a claim insofar as the roadblock was " 'not unreasonable under the circumstances.' " *Id.* A divided panel of the Court of Appeals for the Ninth Circuit affirmed the dismissal on the basis that no fourth amendment "seizure" had occurred. The Supreme Court granted certiorari and reversed.

The Supreme Court began by explaining:

> Violation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the object of

the detention or taking, but the detention or taking itself must be willful. This is implicit in the word 'seizure,' which can hardly be applied to an unknowing act. The writs of assistance that were the principal grievance against which the Fourth Amendment was directed, did not involve unintended consequences of government action.

*Id.* at 596, 109 S.Ct. at 1381 (citations omitted).

The Supreme Court explained that a seizure occurs only when "there is a governmental termination of freedom of movement through means intentionally applied." *Id.* at 597, 109 S.Ct. at 1381. The Court concluded that the facts in *Brower*, taken in the light most favorable to the petitioner, could set forth a claim for a seizure because the roadblock in question was "designed to produce a stop by physical impact if voluntary compliance does not occur." *Id.* In noting that whether the officers subjectively intended for Brower to collide with the roadblock rather than stop, the Court cautioned:

> In determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg. We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.

*Id.* at 599, 109 S.Ct. at 1382.

Following *Brower*, at least three courts have applied *Brower* in the context of accidental shootings of suspects in the course of an arrest or seizure. *Troublefield v. City of Harrisburg*, 789 F.Supp. 160 (M.D.Pa.1992), aff'd 980 F.2d 724 (3d Cir.1992); *Matthews v. City of Atlanta*, 699 F.Supp. 1552 (N.D.Ga. 1988); *Glasco v. Ballard*, 768 F.Supp. 176 (E.D.Va.1991). Additionally, at least one court prior to *Brower* addressed whether an accidental shooting could constitute a seizure. *Dodd v. City of Norwich*, 827 F.2d 1 (2d Cir.1987);

In *Matthews, supra*, a police officer was in the process of arresting the decedent when his gun accidentally discharged. The accident occurred when the truck operated by the decedent "unexpectedly lurched forward causing contact with the truck's door and the officer's hand or weapon." *Matthews v. City of Atlanta*, 699 F.Supp. 1552, 1555 (N.D.Ga. 1988). In *Glasco, supra*, the police officer pulled over a shoplifting suspect. As the officer exited his vehicle and drew his weapon, his police car began to roll. In order to stop the vehicle, the officer leaned back into the car, put his foot on the brake and placed the car in park. In the process, the gun accidentally discharged. *Glasco v. Ballard*, 768 F.Supp. 176, 177 (E.D.Va.1991). In *Dodd, supra*, the decedent, an apprehended burglar, was inadvertently shot "during a struggle initiated by him in an attempt to disarm the arresting officer and after he had apparently surrendered." *Dodd v. City of Norwich*, 827 F.2d 1, 7 (2d Cir.1987). In *Troublefield, supra*, the plaintiff had just been handcuffed when the officer began to reholster his gun. *Troublefield v. City of Harrisburg*, 789 F.Supp. 160, 162 (M.D.Pa. 1992), aff'd 980 F.2d 724 (3d Cir.1992). As he did so, the plaintiff was accidentally shot.

In all four cases, the courts concluded that the plaintiffs could not maintain Fourth Amendment claims against the officers because the officers lacked intent to seize the victims by firing the guns. Further, the courts were unpersuaded by the argument made by the plaintiffs in the instant case that once a seizure had occurred, all claims for excessive use of force, whether volitional or not, are governed by the Fourth Amendment "reasonableness" standard. As the court in *Troublefield* explained:

> The court can see no principled reason for applying what is essentially a negligence standard (i.e. "reasonableness") to an officer's conduct in a situation where a suspect is accidentally shot while in the process of being apprehended (only moments after the initial confrontation, one may surmise), but in holding that no fourth amendment "seizure" is present where an officer is chasing a suspect and his gun accidentally discharges. *See Dodd v. City of Norwich,*

827 F.2d 1, 7–8 (2d Cir.1987) (discussing place of negligence concepts in fourth amendment jurisprudence). If Salada had intended to shoot, he would have upped the ante and, in effect, brought about a second seizure of Troublefield. This is, as recognized by many of the cases discussed above, a fine distinction.

*Id.* at 166.

Application of those cases compels this court to dismiss plaintiffs' fourth amendment claims. Although plaintiffs acknowledge *Troublefield*, the plaintiffs' attempt to distinguish the case is unpersuasive[4]. The simple fact of this case is that Clark was not intentionally shot. Plaintiffs attempt to distinguish *Troublefield* by citing their expert, who suggests that Buchko acted with "recklessness" or "gross negligence." Terms aside, plaintiffs acknowledge that Buchko did not commit a volitional act in firing the gun. As the Supreme Court explained in *Brower*, no seizure occurs unless "there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. Inyo County*, 489 U.S. 593, 597, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1988). Accordingly, plaintiffs cannot maintain a Fourth Amendment claim.

■ Moreover, I find the volitional use of force in this case entirely reasonable. The only improper act plaintiffs can point to in Buchko's conduct was the distance he maintained from a suspect who chose to ignore lawful police instructions. Under the circumstances, however, it is hard to imagine what other choice Buchko had but to approach Clark and attempt to subdue him. As discussed above, Clark was considered armed and dangerous and had allegedly told the cooperating witness moments earlier that he would kill a police officer before being arrested. At the time it was suspected that he may have a weapon hidden. Additionally, Buchko could no longer see Clark's hands as Clark rose up. Finally, Clark was not obeying the officer's lawful commands. Under these circumstances, approaching Clark for the purpose of securing him and preventing

Clark from becoming a danger to the officers on the scene was not objectively unreasonable. Accordingly, this court will grant defendants' motion to dismiss plaintiffs' Fourth Amendment claims.

■ Turning to plaintiffs' Fourteenth Amendment claims, after *Graham*, the First, Sixth, Ninth and Eleventh Circuits have held that excessive-force claims of this nature which do not involve "seizures" may be actionable under the Fourteenth Amendment. In *Landol–Rivera v. Cruz Cosme*, 906 F.2d 791, 796 n. 8 (1st Cir.1990), the First Circuit rejected the theory that all claims arising in the context of police stop or arrest implicate the Fourth Amendment. *Pleasant v. Zamieski*, 895 F.2d 272, 276 n. 2 (6th Cir.1990); *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 882 F.2d 1398, 1408 n. 10 (9th Cir. 1989), *cert. denied* 494 U.S. 1016, 110 S.Ct. 1317, 108 L.Ed.2d 493 (1990); *Wilson v. Northcutt*, 987 F.2d 719, 722 (11th Cir.1993). This conclusion is consistent with that of the Second Circuit in *Dodd v. City of Norwich*, 827 F.2d 1, 7–8 (2d Cir.1987). Additionally, the Third Circuit has applied the due-process clause in analyzing a police excessive-force claim where the excessive force does not involve a "seizure" by law enforcement officers. *Fagan v. City of Vineland*, 22 F.3d 1296, 1305 n. 5 (3d Cir.1994) (en banc). Guided by these authorities, this court will discuss the viability of plaintiff's claim under the due process clause.

In *Fagan v. City of Vineland*, the Third Circuit, en banc, held that the substantive component of the Due Process Clause can be violated by government employees only when their conduct amounts to an abuse of official power that "shocks the conscience." *Fagan v. City of Vineland*, 22 F.3d 1296, 1303 (3d Cir.1994) (en banc). Application of this standard applies to both affirmative acts and omissions. *Id.* at 1304.

Guided by these standards, the inquiry is whether Buchko's conduct "shocks the conscience." This inquiry determines whether plaintiffs may maintain a due-process claim

---

4. The court commends the plaintiff for citing the *Troublefield* opinion. To the court's amazement not one of the defendants addressed the relevant

Fourth Amendment analysis nor did any of the defendants address *Troublefield* or *Brower* in their moving or reply briefs.

against Buchko. Applying these standards, it is clear plaintiffs have failed to raise a genuine issue of material fact in regard to this issue. At most, Buchko was negligent for failing to maintain a safe distance, but, as discussed above, his conduct in approaching Clark was reasonable.

In reaching this result, the court notes it is consistent with a number of authorities which have uniformly dismissed due-process claims arising out of accidental shootings. *Rucker v. Harford County, Md.*, 946 F.2d 278, 281 (4th Cir.1991), *cert. denied*, 502 U.S. 1097, 112 S.Ct. 1175, 117 L.Ed.2d 420 (1992) (plaintiff could not state a claim for violation of substantive due process, because the facts of the case did not demonstrate "a brutal and inhumane abuse of official power literally shocking to the conscience."); *Landol–Rivera v. Cruz Cosme*, 906 F.2d 791 (1st Cir. 1990) (plaintiff could not establish a Fourteenth Amendment due-process claim for inadvertent shooting of hostage because the plaintiff could establish, at most, negligence). Additionally, this courts opinion does not deny plaintiffs a remedy. It only denies plaintiffs a cause of action against Buchko under § 1983 for an accidental shooting.

■ Plaintiffs only remaining claim is their *Monell* claim for municipal liability. Under § 1983 there is no respondeat superior liability. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694–695, 98 S.Ct. 2018, 2037–2038, 56 L.Ed.2d 611 (1978). Rather, a municipality can be sued directly under section 1983 only where action pursuant to a municipal custom or policy causes a constitutional tort. In *Monell* the Supreme Court defined such a municipal policy as a "statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690, 98 S.Ct. at 2036. The Court defined a "custom or usage" for purposes of § 1983 as "such practices of state officials [that are] so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* at 691, 98 S.Ct. at 2036 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–168, 90 S.Ct. 1598, 1613–1614, 26 L.Ed.2d 142 (1970)).

In *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court held that a municipality can be liable under § 1983 for inadequately training its employees. The Court, however, limited this basis of liability to only those cases "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388, 109 S.Ct. at 1205. The Supreme Court explained:

> This rule is most consistent with our admonition in *Monell*, 436 U.S., at 694, [98 S.Ct. at 2037–2038], and *Polk County v. Dodson*, 454 U.S. 312, 326 [102 S.Ct. 445, 454, 70 L.Ed.2d 509] (1981), that a municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.' Only where a municipality's failure to train employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.

*Id.*

■ In the instant case, plaintiffs advance two arguments. First plaintiffs suggest that the Hamilton police department had a custom of permitting the use of excessive force by police officers. Plaintiffs rely on the expert report of Dr. Fyfe who examined the records of prior civil suits against Hamilton Township as well as the deposition testimony of Sgt. Racine regarding an undated alleged "beating" which he had not witnessed. With regard to seven civil suits for assault filed between July of 1986 and May of 1991, as well as what he describes as the grossly inadequate "procedures for processing citizen complaints," Dr. Fyfe writes:

> Although I certainly am not familiar with the facts of all these cases, it is noteworthy that the Township elected to defend so many of them. *Without any more information on the facts of each case, it is impossible to make any determination as to their merits:* but it is my opinion that, taken alone, this number of suits and settlements would have been regarded by any reasonable and competent police administrator as an indication that the depart-

ment's policies and practices concerning use of force were in need of review and revision.

Report of James J. Fyfe, Ph.D., dated January 21, 1996, attached as Def. Taylor's Ex. F (emphasis added)

Based on this "inadequacy" plaintiffs' expert suggests that a custom or policy of permitting excessive use was the proximate cause of Clark's death because, he suggests, Buchko approached Clark without fear of discipline. Dep. of Dr. Fyfe, Pl.Ex. C. at 138. The argument must fail. First, none of these incidents which Dr. Fyfe relies upon are alleged to involve the use of deadly force. Second, the facts in this case demonstrate a nonvolitional use of force; thus, it is inconceivable how a custom or policy could cause a nonvolitional act. Finally, plaintiffs fail to point to factual examples from which this court could infer a custom or policy of permitting excessive force.

The second inquiry is whether Buchko was improperly trained on the necessary safe distance to maintain, and if that insufficient training was the result of a "deliberate or conscious choice made by city policy makers." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). This liability can exist notwithstanding the conclusion that the officer's conduct did not violate the constitution.

In the instant case, plaintiffs acknowledge that the police officers were trained in the use of deadly force, the use of force in performing an arrest, and the use of firearms. Plaintiffs claim, however that "Hamilton Township did not provide any training regarding the distance an officer should keep between himself and a suspect when armed with a shotgun." Pl.Br. At 15. Plaintiffs suggest that this specific omission establishes deliberate indifference on the part of Hamilton Township. Plaintiffs' expert writes:

Chief Taylor, who stated that he knows of no training or manuals that instruct officers how to subdue suspects while holding shotguns or while at close quarters. The major reason for his lack of knowledge on that subject is that training related to it *should* encourage officers who are holding shotguns not to attempt to physically sub-

due suspects and not to come within close distance to them.

Report of James J. Fyfe, Ph.D., dated January 21, 1996, attached as Def. Taylor's Ex. F. (emphasis added)

Thus, according to plaintiffs, this establishes that Hamilton Township deliberately chose not to train officers that they should not seek to physically apprehend a suspect when holding a weapon.

Notably absent from plaintiffs' brief is any discussion of any prior instances of HTPD officers' accidentally discharging guns while subduing suspects. Also absent is any discussion of the prior use of deadly force, or injuries caused by officers attempting to subdue suspects while armed. Also missing is any example of injuries caused as a result of an officer approaching a suspect too close, and thereby causing injury. Finally, the record does not present any evidence to suggest that any conscious choice was ever made to deliberately not train officers on the need to maintain an arm's-length distance when apprehending a suspect while holding a weapon. Accordingly, no failure to train claim can exist.

For the above discussed reasons, defendants' motions for summary judgment will be granted and plaintiffs' constitutional claims contained in Counts One through Three will be dismissed. Because this court lacks subject-matter jurisdiction over plaintiffs' pendent state-law claims contained in counts Five through Nine they will be dismissed without prejudice.

In dismissing plaintiffs state law claims, this court has considered whether plaintiffs will be time-barred from bringing suit in state court if this court determines the claims are not within this court's supplemental jurisdiction. The court has concluded that the claims will not be time barred. 28 U.S.C. 1367(d) provides that "[t]he period of limitations for any claim asserted under subsection (a) ... shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." Additionally, I am convinced that plaintiffs are free to file such claims in the Superior Court of New Jersey

in view of established law in New Jersey tolling the statute of limitations during the pendency of a federal claim. *Galligan v. Westfield Centre Service, Inc.*, 82 N.J. 188, 412 A.2d 122 (1980). These claims will therefore be dismissed without prejudice.

An order was entered July 18, 1996.