Rodney ROUGHT and Gabrielle
Rought, Plaintiffs,

v.

Michigan State Police Officer William
PORTER, in his individual
capacity, Defendant.

No. 1:96 CV 195.

United States District Court,
W.D. Michigan,
Southern Division.

Dec. 26, 1996.

**990**

Nancy Caine Harbour, Miller, Cohen, Martens, Ice and Geary, P.C., Southfield, MI, for Plaintiffs.

Lawrence P. Schneider, Knaggs, Harter, King & Brake, Lansing, MI, for Defendant.

### OPINION

ENSLEN, Chief Judge.

This matter is before the Court on Defendant William Porter's motion for summary judgment. For the reasons which follow, the motion is granted in part and denied in part.

### I.

This case involves claims for personal injury and loss of consortium by plaintiffs Rodney and Gabrielle Rought (a narcotics detective employed by the Kalamazoo County Sheriff's Department and his wife) caused during a drug raid conducted by the Southwest Enforcement Team ("SWET") on July 29, 1994, in Van Buren County, Michigan. Prior to that raid, defendant William Porter had been a marksmanship instructor with the Michigan State Police. As such, he taught Michigan State Police trainees both marksmanship and State Police policy regarding use of deadly force. Such policy requires that an officer determine, before using deadly force, that an assailant is armed (i.e. that the assailant has the ability to shoot), that the assailant is in firing range of the officer (i.e. that the assailant has the opportunity to shoot), and that the officer is "in jeopardy" of being shot by the assailant (i.e. there is some likelihood that the assailant will shoot the officer).

In February 1994, Porter was given a probationary promotion to the position of Lieutenant and assigned to the position of team leader of SWET. The SWET officers he supervised consisted of officers from local sheriff's departments in Southwestern Michigan. These officers made some complaints about Porter's lack of training in narcotics and undercover enforcement as well as their treatment generally.

In July of 1994, SWET intercepted a large load of marijuana that was to be shipped by the United Parcel Service to a wooded property in Columbia Township in Van Buren County, Michigan. SWET then obtained a search warrant for the residence and planned to make a controlled delivery of the marijuana to the residence with Porter posing as a U.P.S. driver. Officer Rought was positioned in army fatigues in the woods adjoining the residence. Porter delivered the marijuana and met with other officers waiting to execute the warrant. While this was happening, the occupants left the home and started firing into the woods. Rought radioed Porter that shots were being fired and he needed assistance. He described the assailants as wearing a red shirt and white shirt, respectively.

Rought's call brought the immediate attention of seven other SWET officers who assembled in the driveway. They called over a

loud speaker to the assailants and ordered them to surrender. During this time, Porter took aim in the direction of the woods. Rought called SWET members over his radio and told them he was crawling out of the woods. A Van Buren sheriff's deputy then activated his siren to create a diversion for Rought. As Rought began to crawl out some officers ordered him to put his hands up. Rought responded over the radio by saying that it was he Rought who was crawling out. Officer Vaughn of Kalamazoo then yelled at all of the other officers (including Porter) that Rought was coming out of the woods—which message they acknowledged. The Van Buren deputy then activated his siren a second time and Rought crawled out. Porter, who was not then listening to radio transmissions, fired four shots in quick succession at Rought—three of which struck Rought.

Officer Picketts of the Calhoun County Sheriff's Department described Porter's reaction as follows:

Rod came out into a clearing, and he stopped and looked up at me, and he was looking at me and that's when he got shot.... I have seen about everything you can see but I'll tell you what, this has been like a nightmare. Rod crawled out of there, he stopped, he looked at me, I looked at him right in the face and next thing I heard was a shot.

I was probably between 20 to 30 feet away from where Rod came out, and Rod looked up at me and I could tell it was Rod. He didn't have no mask over his face, he wasn't carrying a long gun, he wasn't wearing a white shirt or white shorts like the description was with the guy with the gun. And Bill Porter wasn't any further away from him than I was.

Picketts' Dep. at 70–71, 76–77.

Following this incident, William Porter was charged with the misdemeanor of discharge of a firearm causing injury without malice under Michigan Compiled Laws Section 750.235. He pled no contest to this offense on February 16, 1995, before Van Buren Circuit Court Judge William Buhl. Rought sustained serious gun shot injuries to his arm, back and hip which prevented him from returning to work until May 1996 when he was assigned work as a uniformed traffic and patrol officer. During his recovery, plaintiff Gabrielle Rought quit work in order to care for her husband at home.

## II.

This motion requests summary judgment pursuant to Federal Rule of Civil Procedure 56. According to the Rule, summary judgment is proper only if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *City Management Corp. v. U.S. Chemical Co., Inc.,* 43 F.3d 244, 250 (6th Cir.1994).

Accordingly, a party seeking summary judgment bears the initial burdens of specifying the basis upon which it contends judgment should be granted and of identifying that portion of the record which, in its opinion, demonstrates the absence of a genuine issue of material fact. *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 800 (6th Cir.1994). Once this initial burden is met, the non-moving party has the burden to come forward with specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial. *Bill Call Ford, Inc. v. Ford Motor Co.,* 48 F.3d 201, 205 (6th Cir.1995); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment against the non-movant is appropriate where the non-movant, after adequate time for discovery on material matters at issue, fails to make a showing sufficient to establish the existence of a material disputed fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). However, the Court is not to make credibility determinations, nor weigh evidence, nor draw jury inferences. Rather, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Id.*

## III.

Defendant Porter has made several arguments in support of summary judgment in-

cluding: that claims under 42 United States Code Section 1983 should be dismissed because of qualified immunity; that proof of gross negligence in the context of a Fourth Amendment seizure does not support a claim under 42 U.S.C. Section 1983; that case law defining a *Bivens*-type action under the Michigan Constitution precludes recovery where there is no proof of action pursuant to a governmental custom or policy; that all state and federal claims against Porter are precluded by the Fireman's Rule; that plaintiffs are precluded from suing Porter by the exclusivity provisions of the Michigan Worker's Disability Compensation Act; and, that state law claims for ordinary negligence are precluded by governmental immunity under state law. The Court will address each of these arguments—though not in the order in which they were made.

### A. Qualified Immunity and Gross Negligence

Both parties agree that the federal excessive force claim under 42 U.S.C. Section 1983 is premised on the Fourth Amendment as stated in *Graham v. Connor,* 490 U.S. 386, 394–95, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989). They also agree that the standard for violation of the Fourth Amendment by use of excessive force is the objectively reasonable test stated in *Graham v. Connor, supra.* According to the Supreme Court in *Graham,*

> "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," ..., however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id.* at 396, 109 S.Ct. at 1872 (citations omitted). Of course, the officer's subjective motives-whether good or ill—are not relevant to the question of whether the use of force was justified. *Id.*

Defendant, however, maintains further that the Supreme Court in *Graham* clearly intended to exclude cases such as this when it said that,

> "The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested, ..., nor by the mistaken execution of a valid search warrant on the wrong premises,.... With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: .... The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapid evolving—about the amount of force that is necessary in a particular situation."

*Graham, supra* at 396–97, 109 S.Ct. at 1871–73. Defendant thus argues that the use of force was "objectively reasonable" in the same way that a mistaken arrest might be under the above *dicta.*

Defendant further relies on the principle of qualified immunity, which protects an officer from liability for tortious conduct in circumstances where an officer advised of settled law at the time could reasonably conclude that the conduct was justified. *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 536–37, 116 L.Ed.2d 589 (1991). Of course, this determination of qualified immunity is one the Court must make in light of the facts of the particular case and the settled law at the time of the events in question. *Hunter, supra.*

As the parties' arguments largely ignore, the determination of reasonableness under *Graham* depends in part on the "nature and quality of the intrusion." *Graham, supra* at 396, 109 S.Ct. at 1871. In this case, the Fourth Amendment interest is especially strong since the force at issue is deadly force. Under well-established Supreme Court law, deadly force is only justified if the officer has probable cause to believe that use of deadly force against the suspect is necessary to prevent a significant threat of death or physical injury to the officer or others. *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *Washington v.*

*Newsom,* 977 F.2d 991 (6th Cir.1992); *Brandenburg v. Cureton,* 882 F.2d 211 (6th Cir. 1989); *see also Atchinson v. District of Columbia,* 73 F.3d 418 (C.A.D.C.1996).

■ In this case, there is at the very least a question of fact as to whether the defendant's conduct was "objectively reasonable" so as to be excessive and in violation of the Fourth Amendment. Indeed, notwithstanding the seriousness of the situation, the Court now determines that application of the doctrine of qualified immunity is not appropriate in this case.[1] As the above factual summary makes clear, defendant Porter did not ascertain prior to shooting whether his target was in possession of a firearm and whether his target posed any threat to him or his fellow officers. Indeed, the testimony of officer Picketts suggests that Porter barely looked at his target before firing four shots at him. This mistake was serious and indeed has been adjudicated criminal. Because the law clearly forbids the use of deadly force without probable cause justifying its need and requires at least minimal efforts to confirm that probable cause exists, no reasonable officer apprised of the law could have believed that this conduct was justified. Therefore, defendant Porter is not entitled to summary judgment on the issue of qualified immunity.

Related to this issue, defendant Porter also claims that he is entitled to summary judgment on these claims because the evidence establishes at worst that his conduct was grossly negligent and that mere negligence cannot provide a basis for liability under 42 U.S.C. Section 1983. *See Collins v. City of Harker Heights,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *Lewellen v. Metropolitan Government of Nashville,* 34 F.3d 345, 349 (6th Cir.1994); *Gazette v. City of Pontiac,* 41 F.3d 1061, 1066 (6th Cir.1994). However, the pertinent case law on this subject deserves careful study so as not to be misapplied. The *Harker Heights* decision stands for the proposition that to establish a right to recovery under Section 1983 the plaintiff must prove, first, a deliberate consti-

tutional violation and, second, that the person sued is responsible. *Id.* at 1066. Thus, the decision in *Harker Heights* and the corresponding decision in *Lewellen, supra,* eschewed liability for merely negligent conduct and reserved liability under Section 1983 for incidents of intentional constitutional violations. *Lewellen, supra* at 351. However, with this said, the Court must determine whether there is liability for a Fourth Amendment constitutional violation by consulting the law governing Fourth Amendment seizures in *Graham v. Connor, supra* and *Tennessee v. Garner, supra.*

■ In this case, defendant Porter intentionally used deadly force toward his target (who happened to be officer Rought). This is not a case in which a shot was fired accidentally—which is clearly not a seizure under the Fourth Amendment. *See Wilson v. Beebe,* 770 F.2d 578 (6th Cir.1985)(en banc); *Clark v. Buchko,* 936 F.Supp. 212, 218–19 (D.N.J.1996). Rather, this is a case where, in the words of the United States Supreme Court, "there is a governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo,* 489 U.S. 593, 597, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989). In *Brower,* perhaps the leading Supreme Court decision on when a "seizure" occurs, the Supreme Court said that a "seizure occurs even when an unintended person or thing is the object of the detention or taking ..." *Id.* at 596, 109 S.Ct. at 1381. In so holding the Supreme Court cautioned:

> In determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line ... We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.

*Id.* at 598–99, 109 S.Ct. at 1382. In light of such law, it is clear that a constitutional seizure of Rought did occur. Furthermore, in light of the facts that there were six other officers who were positioned nearby Porter

1. The Court is forced under *Hunter* and other Supreme Court case law to resolve the issue of qualified immunity now. However, the question

of whether excessive force was used in violation of the Fourth Amendment is, as required by Rule 56, left for the jury to determine.

and who did not use deadly force because in their judgment at the time it was unwarranted and that Rought was clearly visible and not an aggressor, it also appears that use of deadly force to effect that seizure may have been unreasonable. As such, summary judgment in favor of defendant Porter is unwarranted.[2]

### B. Fireman's Rule and Workers Compensation Limitations

Defendant Porter also requests summary judgment on both federal and state law claims pursuant to the Fireman's Rule and the exclusivity provisions of the Michigan Worker's Disability Compensation Act, Mich. Comp. Laws §§ 418.101 *et seq.* The defense of the so-called Fireman's Rule is a traditional state rule of immunity which, if applicable, would bar both state and federal claims against the defendant. *See Kreski v. Modern Wholesale Elec. Supply Co.,* 429 Mich. 347, 358, 415 N.W.2d 178 (1987); *also Imbler v. Pachtman,* 424 U.S. 409, 418, 96 S.Ct. 984, 989, 47 L.Ed.2d 128 (1976). The provisions of the Michigan Worker's Disability Compensation Act are also significant since the law would bar recovery for personal injuries not caused by intentional tortious conduct by the employer. See Mich. Comp. Laws § 418.131.

First, with respect to the Fireman's Rule, this Rule has been established by the Michigan Supreme Court as a common law defense to actions by public safety officers against private or public parties for injuries the officers sustained in the course of their normal duties. *Woods v. City of Warren,* 439 Mich. 186, 482 N.W.2d 696 (1992). The Rule makes a great amount of sense in that the injuries usually suffered by police officers are expected in a dangerous profession and are usually compensated through the worker's compensation system. Nevertheless, the Rule is limited by case law to "injuries arising from the normal, inherent, and foreseeable risks of the chosen profession."

*McGhee v. State Police Dept.,* 184 Mich.App. 484, 486, 459 N.W.2d 67 (1990); *see also Kreski, supra.* In this case, the application of the doctrine is questionable. While shooting by a felon or even an accidental discharge by another officer would appear to be "normal" risks of a safety officer's duties, it is much less clear that the risk of being shot by a fellow officer who is clearly not following constitutionally-mandated department policies regarding use of deadly force is a "normal" risk of performing one's duties. Accordingly, summary judgment on this ground is denied.

Relating to the Michigan Worker's Disability Compensation Act, such Act provides generally that when an employee is injured in the performance of his employed duties that his sole remedy against his employer is an award of disability compensation damages under the statute. Mich. Comp. Laws § 418.131. In addition, the Act (Mich. Comp. Laws § 418.827) bars an employee from suing a fellow employee for injuries sustained during employment. *See Kenyon v. Second Precinct Lounge,* 177 Mich.App. 492, 442 N.W.2d 696 (1989). For this reason, the Michigan Court of Appeals in the case of *Berger v. Mead,* 127 Mich.App. 209, 338 N.W.2d 919 (1983), held that a state multi-jurisdictional police task force which operated under a formal operating agreement constituted a "joint venture." This meant that when an employee of the "joint venture" was injured by a fellow employee of the venture, the Act barred him from suing the fellow employee.

Since the defense asserted is one of state law, the Court must determine how the Michigan Supreme Court views the law with respect to the fellow-employee exclusion under the Michigan Worker's Disability Compensation Act. *Bailey Farms Inc. v. NOR-AM Chem. Co.,* 27 F.3d 188, 191 (6th Cir. 1994). Since the Michigan Supreme Court has not addressed this issue as it pertains to

---

2. This discussion also discloses the answer to another question: whether defendant may be liable under state law—which grants immunity for acts of ordinary negligence. *See* Mich. Comp. Laws § 691.1407. Since the tortious conduct in question is in the nature of an intentional tort, there is at least a question of fact as to whether this defense applies. Of course, the Court will instruct the jury that they cannot return a verdict for the plaintiffs based on evidence of ordinary negligence and to this extent the motion is granted and the portion of the complaint charging ordinary negligence will be dismissed.

multi-jurisdictional task forces, this Court must discern how it would hold from "all available data" including rulings of lower appellate courts. *Kingsley Assoc. v. Moll PlastiCrafters, Inc.,* 65 F.3d 498, 507 (6th Cir. 1995). The decision in *Berger* is certainly important to this analysis.

■ However, the facts and analysis of *Berger* deserve careful study and analysis. First of all, in determining whether there was a joint venture which employed the officers, the *Berger* Court borrowed from traditional case law defining "joint ventures" under Michigan law—but adopted that case law by holding that the venture need not have a for-profit objective. Thus, according to *Berger*, there is a joint venture for worker's compensation purposes whenever there is: (1) an agreement indicating an intention to undertake a joint venture; (2) a joint undertaking; (3) a contribution of skills or property by the parties; and (4) community interest and control over the subject matter of the enterprise. *Berger, supra* at 214–15, 338 N.W.2d 919. As noted by plaintiffs, the defendant here, unlike the defendant in *Berger,* is not relying on a formal written agreement which indicates an intention of police departments to undertake a joint venture. What is more, the defendant has failed to file any evidence (other than that there was in fact a task force which was operating on the day in question) to support his assertion that the participating departments had formed an agreement to undertake a joint venture and met the other requirements of a joint venture under the case law.

■ Second, even if one could conclude that such a joint venture was formed, the legal analysis in *Berger* required an analysis of a four factor "economic reality" test before concluding that the employees in question were both employees of the joint venture. In *Berger,* three of these four factors were met such that the Court of Appeals could conclude that a jury could not draw conflicting conclusions and that summary judgment was appropriate. *Id.* at 217–18, 338 N.W.2d 919. In this case, unlike *Berger,* only two of the four factors are met since the task force neither paid Rought's wages nor had authori-

ty to discipline him. Also, there is some testimony that the participating departments' participation in the task force "changed like the wind." In light of such factual disputes, a reasonable jury could draw conflicting conclusions from the evidence such that summary judgment is inappropriate. Accordingly, summary judgment on the ground of the Worker's Disability Compensation Act is denied.

### C. Michigan Constitutional Claims

■ Defendant also asks that the Court dismiss plaintiffs' claims for violation of the Michigan Constitution. The limited Michigan case law on this subject indicates that a plaintiff may not make a *Bivens*-type state constitutional claim against an individual governmental officer without alleging and proving that the individual officer acted pursuant to some governmental policy or custom. *Johnson v. Wayne County,* 213 Mich. App. 143, 150–51, 540 N.W.2d 66 (1995). The Court notes that there is no evidence in the record of any government custom or policy favoring use of deadly, excessive force. Plaintiffs have failed to respond to this argument and have failed to present any such evidence. Therefore, the Court determines that the defendant is entitled to summary judgment on plaintiffs' claims alleging violation of the Michigan Constitution.[3]

### IV.

Consistent with this Opinion, defendant's motion for summary judgment/dismissal pursuant to Federal Rules of Civil Procedure 12 and 56 is granted in part and denied in part as stated in the Court's Opinion. The Court shall enter an Order consistent with this Opinion.

### *ORDER*

In accordance with the Court's Opinion of this date;

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment and/or dismissal is **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** that the plaintiffs' claims under the Michigan Consti-

---

**3.** In defendant's reply brief, he withdraws his motion to dismiss the pendent party claims for loss of consortium—which, accordingly, are not discussed here.

tution and under state law for ordinary negligence are **DISMISSED WITH PREJUDICE** pursuant to Federal Rule of Civil Procedure 12. Otherwise, the motion is **DENIED**.